**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE IS**[redacted] 05 325 ML

| | | |
|---|---|---|
| **SHIRLEY ASAN, on behalf of herself and all others similarly situated 62 Walnut Street Johnston, Rhode Island 02919** | * * * * * | **CIVIL ACTION NO. ________** |
| **Plaintiff,** | * * | **CLASS ACTION COMPLAINT** |
| **MERCK & CO., INC., Whitehouse, New Jersey,** | * * * | |
| **Defendant.** | * | **TRIAL BY JURY REQUESTED** |

**CLASS ACTION COMPLAINT**
**FOR MEDICAL MONITORING AND ANCILLARY RELIEF**

Plaintiff, Shirley Asan, on behalf of herself and all others similarly situated, allege as follows:

## I. INTRODUCTION

1. This case involves the prescription drug VIOXX® ("Vioxx"), which was researched, developed, manufactured, marketed, promoted, advertised and sold by Defendant Merck & Co., Inc. ("Merck") for relief of pain and inflammation (swelling and soreness) of osteoarthritis, rheumatoid arthritis, management of short-term pain, treatment of menstrual pain, and treatment of migraine headaches. At all times relevant to this action, Merck misrepresented the safety of Vioxx and negligently manufactured, marketed, advertised, promoted and sold Vioxx as a safe prescription medication when, in fact, Merck knew, and had reason to know, that it was not safe for its intended purpose for patients for whom it was prescribed and to whom it was sold; and that Vioxx causes serious medical problems, and in certain patients, catastrophic injuries and deaths.

2. This is a class action filed on behalf of putative classes consisting of all persons who ingested the drug Vioxx. This action seeks, among other relief:

a. Medical monitoring to enable people who ingested Vioxx to be monitored for the existence of potentially dangerous side effects, and silent and latent injuries caused by the drug including, but not limited to, silent myocardial infarction, deep vein thrombosis, silent cerebrovascular injuries, and cardiac damage: and,

b. Emergency notice of the dangers posed by Vioxx.

3. Medical tests and diagnostic procedures, including an electrocardiogram, are available and can provide early detection of the deleterious health effects resulting from Vioxx use. These tests and procedures will aid in reducing the harm caused by Vioxx by allowing for the diagnosis and treatment of silent and latent serious injuries and diseases that may otherwise go undetected until further injuries and harm have resulted. These diagnostic tests and procedures are not provided for patients in their ordinary and usual care and are necessary to detect the silent and latent injuries that the use of Vioxx has caused.

4. In the public press, Merck estimates that there were 105 million U.S. prescriptions written for Vioxx from May 1999 through August 2004. Based on this estimate, Merck estimates that the number of patients who have taken Vioxx in the United States since its 1999 launch is approximately 20 million.

5. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek class certification of a class of all persons who reside in Rhode Island and took Vioxx at any time during the period when it was first approved for sale by the United States Food and Drug Administration (the 'FDA") until September 30, 2004.

## II. PARTIES

6. Plaintiff Shirley Asan, is a citizen of Rhode Island residing at the address in the caption above. Plaintiff was prescribed, purchased or was given samples of, and ingested Vioxx. Plaintiff is at a significant increased risk of having suffered an unrecognized myocardial infarction (UMI) and/or ischemic stroke. Plaintiff has not been diagnosed with a cardiovascular injury including a myocardial infarctions (heart attack) which can be either full blown or silent, ischemic strokes, and or deep vein thrombosis but is at an increased risk for developing such conditions as a proximate result of the her ingestion of Vioxx. She will not receive the requisite medical screening and be screened for UMI and/or ischemic stroke unless a court-supervised Medical Monitoring Program is implemented.

7. Plaintiff brings this action on her behalf and for all other individuals who are similarly situated.

8. Defendant Merck was and is an American pharmaceutical company, incorporated under and by virtue of the laws of the State of New Jersey. Its headquarters is located at One Merck Drive, Whitehouse Station, New Jersey.

9. Merck does business throughout the United States, and worldwide selling its pharmaceutical products.

10. At all times relevant, Merck developed, manufactured, promoted, advertised, distributed and sold Vioxx in interstate commerce and throughout the United States and foreign countries.

11. At all times relevant, Merck was engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling, promoting, advertising and marketing, either

directly or indirectly through third parties or related entities, the pharmaceutical product known as Vioxx.

## III. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (diversity) in that the state of citizenship of the representative Plaintiff is different from the state of citizenship of the Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs as to plaintiffs and each member of the proposed Class.

13. Venue is proper pursuant to 28 U.S.C. § 1391. The defendant has sufficient minimum contacts with Rhode Island or otherwise intentionally avails itself of the consumer markets within Rhode Island through the promotion, sale, marketing and/or distribution of its products in the State to render the exercise of jurisdiction by the Rhode Island courts permissible under traditional notions of fair play and substantial justice.

## IV. FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A. Vioxx is a Non-Steroidal Anti-Inflammatory Drug ("NSAID") That Selectively Blocks the Production of Cyclooxygenase-2 ("COX-2")

14. Vioxx is the brand name of Rofecoxib and is a Cox-2 inhibitor.

15. Cox-1 and Cox-2 inhibitors are members of a class of drugs known as non-steroidal anti-inflammatory drugs ("NSAIDs") used for pain relief.

16. Generally, NSAIDs prevent the formation of fatty acid cyclooxygenases, certain enzymes, of which there are two known types ("Cox-1" and "Cox-2").

17. Vioxx contains cyclooxygenase 2 ("Cox-2") inhibitory properties, that means that it inhibits an enzyme to control pain.

18. Vioxx, unlike the other drugs in the class of NSAIDs, is generally different from the other NSAIDs because it is solely a Cox-2 inhibitor. As a Cox-2 inhibitor, it does not alter the Cox-1 enzymes, thereby theoretically decreasing the gastrointestinal complications commonly associated with NSAIDs. Further, the inhibition of Cox-2 enzymes is purported to decrease pain and inflammation.

**B. Vioxx is Cardiotoxic**

19. Since Vioxx inhibits COX-2 and not COX-1, unlike the other members of the NSAID class, COX-2 and not COX-1, it among other things, created a homeostatic imbalance that could result in increased aggregation of blood platelets or blood clotting thereby substantially increasing the risk of catastrophic adverse side effects such as myocardial infarctions (heart attacks) – both clinically recognized and unrecognized (silent), ischemic strokes and other serious injuries.

20. Merck knew and had reason to know of these serious adverse events occurring in patients who ingested Vioxx.

21. Merck failed to advise the FDA, the medical community, and the patients about these dangerous side effects incident to Vioxx use.

**C. Merck Knew of Vioxx's Cardiotoxic and Pro-Thrombotic Effects Before it Was Approved and Marketed**

**1) Merck's Knowledge Dates From at Least November 1996**

22. Merck sought to market Vioxx as an alternative to older NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects. As early as November 1996, years before FDA approval of Vioxx in May 1999, Merck recognized that Vioxx, unless taken in conjunction with aspirin, posed a "substantial" risk of "significantly

higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes, and transient ischemic attacks because, as a "selective Cox-2 inhibitor," it lacked aspirin's "antiplatelet [i.e., anti-clotting] effect."

23. In fact, very early in the development program for Vioxx, to demonstrate that it selectively inhibited COX-2, Merck used a platelet aggregation assay to assess its effects on COX-1. That work established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit COX-1. In addition, a Merck-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

24. In February 1997, two months later, Merck researcher Briggs Morrison conceded that "without COX-1 inhibition you will get more thrombotic events and kill drug."

25. Responding to this observation, a Merck colleague, Alise Reicin complained: This is a no win situation! The relative risk of [adverse GI events with] even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients-ie those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be - would we be able to recruit any patients?

26. By early 1998, Merck's own clinical investigators, in fact, based on findings from a Merck-sponsored study (Protocol 023), advised the company that by inhibiting COX-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin-a COX-2 platelet inhibitor that dilates blood vessels-and thromboxane-a COX-1

platelet activator that constricts blood vessels-such that it could provoke the creation of blood clots.

27. In or about May 1998, six months before Merck filed its New Drug Application ("NDA") with the FDA, Merck's Scientific Advisory Board for the drug recommended that researchers "systematically collect data on cardiovascular (CV) events in all clinical trials" for VIOXX. In issuing this recommendation, the Board noted that some of its consultants were concerned that "[b]ased on data on PGI [prostaglandin] metabolism obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."

28. On or about November 23, 1998, Merck submitted a New Drug Application ("NDA") to the FDA for Vioxx 12.5 mg and 25 mg tablets to treat the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

29. On or about May 20, 1999, the FDA approved Vioxx for the relief of the signs and symptoms of acute pain, dysmenorrhea and osteoarthritis, a chronic swelling and painful joint disease affecting one or more joints.

30. At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

31. The "Warnings" section of the labeling for Rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation."

32. Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for Rofecoxib. In conjunction with the sNDA, Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S, Cohort."

33. The VIGOR study was performed from January 6, 1999 through March 17, 2000.

34. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MD-0966 50 mg daily compared to patients in the group taking Naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

35. Merck excluded "high" cardiovascular risk patients from the VIGOR trial.

**2) The VIGOR Study Showed Significant Increases in Cardiovascular Events Occurring in Patients Taking Vioxx as Opposed to Naproxen**

36. Signs of Vioxx's risk of serious adverse events emerged soon after Vioxx's approval.

37. On or about November 18, 1999, Merck's senior biostatistician, Deborah Shapiro, provided a tightly controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board (the "DSMB"), which showed that almost twice as many serious cardiovascular events were occurring among patients taking Vioxx as those taking Naproxen.

38. VIOXX manifested significantly more cardiovascular toxicity than Naproxen by the sixth week of the VIGOR study.

39. In or about March 2000, Merck released the results of the VIGOR study. The study data revealed, among other things, that Vioxx users suffered fives times as many heart attacks than their Naproxen counterparts. In addition, serious cardiovascular events (including heart attacks, ischemic strokes, unstable angina, and sudden unexplained death) were reported for more than twice as many Vioxx as Naproxen patients.

40. At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

41. On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, formerly president of Merck Research Laboratories, concluded that the "CV [cardiovascular] events are clearly there" and stated that Merck should prepare to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e., an effect of the class of selective COX-2 inhibitors) that is "mechanism based as we worried it was" and as some of the company's consultants had maintained.

42. Merck ignored the causal relationship between Vioxx and this significantly increased rate of cardiovascular events in the VIGOR study. Instead, Merck seized upon and widely and continuously disseminated the post hoc rationalization that the VIGOR study showed that Naproxen reduced cardiovascular risk (i.e., it exerted a "cardioprotective effects"), not that Vioxx posed a serious cardiovascular hazard.

43. Merck continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian Pharmacologist Dr. Carlo Patrono, one of Merck's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom Merck regarded as "the world's most respected and knowledgeable" scientist in his field), advised Merck in March 2000, that the dramatic cardiovascular effects observed in the VIGOR study could not be attributed plausibly to Naproxen for several reasons.

44. Furthermore, on or about March 24, 2000, University of Pennsylvania Pharmacologist Dr. Garrett Fitzgerald, then acting as a Merck consultant, advised Merck of a paper in press that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first non-fatal myocardial infarctions in females in an epidemiological study.

45. In or about January 2002, a study by Wayne A. Ray, et al. was published in *The Lancet* that disproved Merck's Naproxen theory, concluding that Naproxen and other NSAIDs had not been shown to protect against the risk of coronary heart disease.

46. After the VIGOR study, evidence of the dangers of cardiovascular and cerebrovascular adverse events associated with Vioxx use continued to surface.

47. In June of 2000, industry-sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which Merck is a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarctions.

48. Merck knowingly downplayed and, in certain instances, withheld from publication, the severity of cardiovascular and cerebrovascular risks associated with Vioxx. For example,

Merck downplayed this information in connection with the *New England Journal of Medicine's* November 2000 reporting regarding the VIGOR study, authored by Merck sponsored authors.

49. On or about May 22, 2001, Merck issued a press release through PR Newswire touting and "reconfirm[ing] the favorable cardiovascular safety profile of Vioxx."

50. In a warning letter it issued four months later, the FDA, severely rebuking Merck, advised that:

> your claim in the [May 22, 2001] press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to Naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the Naproxen treatment group (46 events, 1.1%) in the VIGOR study.

51. On or about August 22, 2001, the *Journal of the American Medical Association* ("JAMA") published an article authored by Cardiologists from the Cleveland Clinic Foundation entitled "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors." The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of more than 15,000 patients, comparing Pfizer's Celebrex in a study called CLASS and the VIGOR study involving Vioxx to placebo. The Cleveland Clinic reported that "the annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group..."

52. One day before, and in anticipation of publication of, the JAMA article, Merck issued a statement claiming: "We have additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo."

53. On or about August 23, 2001, the day after the JAMA article was published, Merck stated in another press release: "The Company stands behind the overall and cardiovascular safety profile of VIOXX."

**3) The FDA Issued A Warning Letter on September 17, 2001, Indicating that Merck Had Engaged in "False or Misleading" Promotion of Vioxx**

54. On or about December 16, 1999, less than seven months after it approved Vioxx, the FDA informed Merck by letter that it had engaged in "false or misleading" promotion of Vioxx. Specifically, the FDA concluded that Merck misrepresented (1) the drug's "safety profile" by claiming that it was "safer than a placebo" and (2) the drug's efficacy through "unsubstantiated" comparisons to the COX-2 inhibitor Celebrex and other NSAIDs.

55. Thereafter, Merck's conduct continued to be so egregious that the FDA issued a "Warning Letter" to Merck on or about September 17, 2001 (hereinafter the "Warning Letter"), which demanded that Merck correct the false and misleading messages contained in the promotional campaign for Vioxx, the Vioxx press releases, and the oral representations made by Merck sales representatives to promote Vioxx.

56. The FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") reviewed the Vioxx promotional activities and materials and warned Merck that its marketing of Vioxx was: "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations."

57. Most, if not all, of the noted misrepresentations were made in reference to Merck's VIGOR study. According to DDMAC, Merck:

> engaged in a promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings that were observed in the VIOXX Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of VIOXX. Specifically,

> your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

58. The Warning Letter delineated the following misrepresentations made in six promotional audio conferences presented on behalf of Merck by Peter Holt, M.D., which were moderated by Merck employees; in Merck press releases; and in oral representations made by Merck sales representatives to promote Vioxx. According to the Warning Letter:

a. Merck, its agents, employees and representatives minimized the rate of myocardial infarctions. For example, in a June 21, 2000, audio-conference, Merck began the discussion of the myocardial infarction rates observed in the VIGOR study by stating: "when you looked at the MI rate, the rate was different for the two groups. The MI rate for VIOXX was 0.4 percent and if you looked at the Naproxen arm it was 0.1 percent, so there was a reduction in the MI's in the Naproxen group." Merck offered what purported to be a scientific explanation, when, in fact, it was purely hypothetical. DDMAC wrote that, as Merck knew, it was misleading to assert:

> that VIOXX does not increase the risk of [heart attacks] and that the Vigor finding is consistent with Naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that VIOXX may have pro-thrombotic properties.

b. Merck knew that the promotional statement was false because the reason for the difference between the MI outcomes for the Vioxx users versus the naproxen users had not yet been determined;

c. Merck carefully excluded from the promotional literature materially relevant information that Vioxx may have pro-thrombotic properties;

d. DDMAC reprimanded Merck for understating the rate of myocardial infarctions. Merck had claimed that the MI rate was 0.2 percent for naproxen and 0.1 percent for Vioxx, which was completely inaccurate. DDMAC wrote:

> Contrary to [Merck's] claim that there was a higher rate of MIs in the naproxen group compared to the VIOXX group, the MI rate for VIOXX in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

e. DDMAC reprimanded Merck for falsely claiming that the MI rate associated with the use of Vioxx was "basically the same as" the crude MI rate in the Celebrex study known as CLASS (Celebrex Long-Term Arthritis Safety Study);

f. DDMAC reprimanded Merck for misrepresenting claims regarding the efficacy of Vioxx as compared to its competitor Celebrex. When publicly comparing the VIGOR study to the CLASS study, Merck failed to inform consumers that the patient populations in the two studies were extremely different. The VIGOR study excluded patients who had angina or congestive heart failure with symptoms that occurred at rest or with minimal activity as well as patients taking aspirin or other antiplatelet agents, all of which, if anything, should have made Vioxx appear to present less cardiovascular toxicity. The CLASS study did not exclude these patients, therefore, making it more likely that the CLASS trial included patients with a higher risk for myocardial infarctions prior to their ingestion of Celebrex. Nevertheless, Merck improperly compared two studies to misrepresent that Vioxx was more effective and safer than Celebrex;

g. Merck failed to point out that the more affordable alternative, naproxen, had been statistically proven to produce half as many myocardial infarctions as Vioxx. These

misrepresentations and omissions were made not only at the promotional audio conferences in June of 2000, but also at the annual meeting of the American Society of Health-Systems Pharmacists ("ASHP") in Los Angeles, California, on June 3 through June 6, 2001;

h. DDMAC reprimanded Merck for making false statements about the risks of Vioxx therapy in patients who were taking warfarin. For example, at an audio conference on June 16, 2000, Merck stated:

> . . . if you look at the thromboembolic agents, it's very clear that these selective COX 2 inhibitors [of which VIOXX is a member] have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin.

This statement is directly contradicted by the precaution in the Product Insert, reprinted in the Physicians Desk Reference ("PDR"), which states: " . . . in post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases with prothrombin time in patients receiving VIOXX concurrently with warfarin."

i. DDMAC rebuked Merck for its false and misleading marketing: Merck's promotional audio conferences and sales representative presentations failed to present the serious and significant risks associated with Vioxx use. They failed to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic type reactions after taking aspirin or other NSAIDS.

59. In those marketing promotional presentations, Merck omitted the warning about the possibility of serious gastrointestinal toxicity occurring with use of Vioxx, such as gastric bleeding, ulceration or perforation; Merck failed to state that Vioxx's Product Insert clearly defines certain precautions for use in patients with liver and kidney disease; failed to include

information about patient populations in which Vioxx use is not recommended such as women in late pregnancy; and failed to include information about Vioxx's most common adverse events: serious cardiovascular and cerebrovascular events such as myocardial infarctions and ischemic strokes.

**D. Adverse Events Continued to Occur Because of Vioxx Use, and Merck Continued to Deny Vioxx's Dangers**

60. According to the FDA Adverse Event Reporting System (AERS), through October 2003, almost 2,000 adverse cardiovascular events were experienced by Vioxx users, including myocardial infarctions, cardiac arrest and cardiac failures.

61. On October 30, 2002, the Wall Street Journal reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]." According to the Wall Street Journal article, within the first 30 days of taking Vioxx, the risk of heart attack was increased 30% as compared to patients taking Celebrex.

62. In or about November 2003, Merck received preliminary results of a study it had commissioned performed by Merck personnel and Alex Walker, an executive at the Ingenix unit of United Health Group. The study revealed a statistically significantly greater incidence of myocardial infarction or unstable angina pectoris associated with use of Vioxx compared to the NSAIDs ibuprofen or diclofenac. The risk did not vary significantly by duration, use, or dose. Merck never revealed the existence, much less the results of this study, prior to its withdrawal of Vioxx from the market in late September 2004.

63. In August 2004, Health Day News quoted the FDA as finding "this [the study referenced in the Wall Street Journal, *supra.* 61] and other studies cast serious doubt on the safety" of Vioxx and that Celebrex "may be safer."

64. However, shortly after the August 24, 2004, FDA statement, Peter S. Kim, President of Merck Research Laboratories was quoted as saying that Merck "strongly disagrees" with the findings of this new study.

65. On August 26, 2004, the Street.com reported: "Merck Thursday released a detailed critique questioning the studies' significance."

**E. Merck Finally Withdrew Vioxx from the Market in Response to Preliminary Results from its APPROVe Study**

66. On or about November 8, 1999, Merck submitted an IND application to the FDA to conduct clinical trials of Vioxx to pursue a claim that Vioxx was effective in preventing colon polyps and ultimately colon cancer.

67. Merck undertook another clinical study called the Adenomatous Polyp Prevention on Vioxx ("APPROVe") trial of Vioxx, 25 mg/day, to try to demonstrate the drug's effectiveness in preventing colon polyps.

68. At its first meeting in or about January 2002, the External Safety Monitoring Board ("ESMB") for the APPROVe trial voiced concerns regarding "trends noted in serious adverse clinical events and in thromboembolic events."

69. On or about September 17, 2004, the ESMB noted that "the trend for excess risk" for heart attacks and strokes "has continued to grow at each meeting over the last 1-2 years." Consequently, the ESMB recommended that participating patients in APPROVe be instructed to discontinue the study treatment.

70. On or about September 27, 2004, Merck advised the FDA of the ESMB's recommendation.

71. On or about September 28, 2004, Merck informed the FDA that it was withdrawing Vioxx from the market.

72. On September 30, 2004, Merck disclosed the outcome of the APPROVe study and announced that it was withdrawing Vioxx from the market after the ESMB overseeing the study recommended that it be halted prematurely because it had implicated the drug in a statistically significant increased risk of confirmed cardiovascular events-principally heart attacks and strokes-in patients taking Vioxx compared to those ingesting a placebo.

73. Merck claims that the APPROVe study did not show a difference between the incidenceof cardiovascular injuries until after 18 months of exposure. However, Merck has concealed from the public its internal analysis showing that, in fact, there was a higher incidence of such injuries in the Vioxx group in BOTH the 0 to 18 months and 19-36 months exposure periods, when all events reported by the clinical trial investigators are considered. Merck included this data in a January 2005 draft of the APPROVe study, but excluded it from the published version a month later. Thus, contrary to the statements Merck has repeatedly made to the public and the FDA, the APPROVe data actually show that Vioxx is dangerous in both the shorter and longer term users.

74. Merck's prior claims of Naproxen cardioprotectivity in the VIGOR study are irrelevant to the APPROVe results, and instead APPROVe reinforces the conclusion that the VIGOR results were due to Vioxx cardiovascular toxicity rather than supposed protection by Naproxen.

75. In APPROVe, the relative risk for adverse cardiovascular events for Vioxx patients already at heightened cardiovascular risk was particularly high. For example, Vioxx patients with a history of symptomatic atherosclerotic cardiovascular disease were approximately 9 ½ times more likely to suffer such events than their placebo counterparts, and those with a history of diabetes were approximately 6 times more likely to experience such events than patients in the placebo arm.

76. More specifically, APPROVe showed a statistically significant Relative Risk of 2.80 for the cardiovascular events category including fatal and non-fatal MI, sudden death due to cardiac causes, and unstable angina; and an overall statistically significant relative risk of 1.92 for all events analyzed, including those referenced above, as well as stroke, trans-ischemic attack (TIA), and peripheral thrombotic events.

77. Relative Risks of this magnitude are almost unheard of in the annals of epidemiology, and they are indicative of both a clear cause-and-effect relationship confirming that Vioxx is a highly hazardous and toxic chemical substance/drug/product. Indeed, the Vioxx Relative Risk of 9.59 is comparable to the Relative Risk for lung cancer among cigarette smokers versus nonsmokers. *See, e.g.*, Centers for Disease Control, *MMWR* August 27, 1993, indicating Relative Risk of 11.9 for smokers versus non-smokers as to cancers of the trachea, lung and bronchus.

78. Even at super-therapeutic doses, no other pain reliever of any kind has ever been reported to have a Relative Risk anywhere close to those found for Vioxx and Cardiovascular disease among high risk patients in APPROVe, again distinguishing Vioxx as the most dangerous drug in its class.

79. Because of the under-diagnosis of the high-risk conditions associated with the most severe risks of Vioxx, the drug inevitably results in its use by the very population most at risk. Patients with prior heart attacks provide a prime example of those at greatest risk of Vioxx' harmful effects, yet who could not be protected from exposure due to under-diagnosis. It is well established and generally accepted that 25 to 30% of all heart attacks are "silent" or "unrecognized" myocardial infarctions (MI's). "The Framingham Study was the first to show that as many as half of all MIs may be clinically silent and unrecognized by the patient." Antman, et al., ACC/AHA Guidelines for the Management of Patients with ST-Elevation Myocardial Infarction-- *Executive Summary, J Am Coll Cardiol* 2004; 44: 671-719.

80. Other under diagnosed conditions are also important. For example, the prevalence of diabetes is of epidemic proportions in the U.S., and the condition often goes undiagnosed for years. *See, e.g.,* Centers for Disease Control, *MMWR* September 5, 2003, "Prevalence of Diabetes and Impaired Fasting Glucose in Adults-- 1999-2000," indicating that 29% of all diabetes cases are undiagnosed. Chronic atherosclerosis can remain silent even when the condition has reached a severe stage that would increase the danger of a drug that promotes cardiovascular disease. All of these undiagnosed, high-risk patients require the imposition of extensive, diagnostic testing that could never be implemented in the real world of cost-conscious medical practice.

81. In the October 6, 2004 edition of the *New England Journal of Medicine,* calls for the medical community were reported:

> [P]atients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate. Given the relatively short half-lives of these compounds, such a dissipation may occur

rapidly. On the other hand, if treatment has accelerated atherosclerosis, the offset of risk may be more gradual.

82. In February 2005, Merck participated in the FDA Arthritis Drug Advisory Committee hearings.

83. Significantly, the super-elevated Relative Risk described above were known to Merck well before the February 2005 Advisory Panel hearings, yet these Relative Risks were never mentioned during any presentations to the Panel, nor were they ever discussed by Panel members in the published record.

84. Vioxx is a hazardous product.

85. The plaintiff and the Class were exposed to Vioxx.

86. Vioxx causes serious cardiovascular disease because it is cardiotoxic, including heart attacks, stroke and other injuries (detected and undetected).

87. There is a demonstrated and significant increase in the chance of heart attacks and stroke (detected and undetected) in persons such as the plaintiff and the Class, who were exposed to Vioxx.

88. There is value of early diagnosis and detection of heart attack and stroke.

89. As a result, medical monitoring in the Vioxx patient population is appropriate and required. The dangers of an unrecognized myocardial infarction ("UMI") and ischemic stroke are particularly acute, since these injuries are not detected by routine medical tests and pose a serious long-term health risk.

## IV. <u>CLASS ACTON ALLEGATIONS</u>

90. Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and all other similarly situated on behalf of a class of consumers.

91. This class is defined and described as follows:

All persons residing within the State of Rhode Island who used VIOXX manufactured, sold, or distributed by Merck from May 20, 1999 through September 30, 2004 (the "Class Period").

92. Excluded from the Class are the defendant, including any parent, subsidiary, affiliate or controlled person of the Defendant and their officers, directors, agents or employees and members of their immediate families. Also excluded from the Class is the judicial officer presiding over the litigation and members of his/her immediate family.

93. Vioxx was widely prescribed and has been ingested by approximately 20 million persons. The members of the Class are so numerous that joinder is impracticable and would involve thousands of individual actions.

94. Plaintiff, Shirley Asan is a member of the Class she seeks to represent.

95. There are questions of law and fact common to the Class including, but not limited to:

a. Whether Vioxx was and is unsafe for human ingestion;

b. Whether defendant designed, manufactured and/or marketed Vioxx with knowledge that it was a dangerously defective product;

c. Whether defendant acted negligently in marketing and selling Vioxx;

d. Whether defendant conducted, either directly or indirectly, adequate testing of Vioxx;

e. Whether defendant failed to adequately warn consumers of the adverse health hazards caused by using Vioxx;

f. Whether defendant falsely and fraudulently misrepresented in their advertisements, promotional materials and other materials, among other things, the safety of using Vioxx;

g. Whether defendant knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Vioxx from governmental regulators, the medical community and/or the consuming public;

h. Whether defendant's post-marketing safety and surveillance system exists, and if so, was designed and implemented in a reasonable manner;

i. Whether defendant designed and manufactured a drug that was dangerously defective because its use leads to or poses a substantial increased risk of the existence of potentially dangerous side effects, including, but not limited to, heart attack and stroke;

j. Whether defendant knew or should have known that the ingestion of Vioxx leads to or poses a substantial increased risk of side effects;

k. Whether defendant continued to manufacture, label, license, market, distribute, promote and/or sell the drug, Vioxx, notwithstanding its knowledge of the drug's dangerous nature and side effects;

l. Whether the warnings and information defendant provided with Vioxx were adequate in warning of the potential hazards resulting from its use;

m. Whether ingestion of Vioxx causes an increased risk of side effects;

n. Whether there exist monitoring and testing procedures that will permit the early detection and treatment of the side effects caused by the ingestion of Vioxx;

o. Whether the increased risk of side effects from the ingestion of Vioxx warrants periodic diagnostic and medical examinations, medical research, and communications to the Class; and,

p. Whether medical monitoring of plaintiff and the proposed Class who used Vioxx is reasonably necessary.

96. These and other questions of law and/or fact are common to the Class and predominate over any question affecting only individual class members.

97. The claims of the class representatives are typical of the claims of the Class in that the named representatives and the members of the Class ingested Vioxx and have not been diagnosed with a cardiovascular injury.

98. The plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in complex class actions and products liability litigation. Plaintiff has no known interests which are adverse to the interests of the other members of the Class. The interests of the plaintiff and the Class they seek to represent are aligned because of their ingestion of Vioxx and their consequential increased risk of the existence of the side effects caused by Vioxx.

99. Class certification is appropriate pursuant to Fed.R.Civ.P. 23(b)(2) because defendant acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to plaintiff and the Class members. Specifically, plaintiff seeks injunctive relief in the form of court order: (1) directing an emergency notice to the Class regarding the dangers of Vioxx; (2) certifying a nationwide class; (3) establishing a court-administered Medical Monitoring Program, to be funded by Merck and, to provide for and/or reimburse medical and diagnostic tests for each member of the Class to detect

unrecognized myocardial infarctions ("UMI") and other latent or unrecognized injuries and, if such injuries are detected and diagnosed, to educate plaintiffs about available treatment strategies; and, (4) ordering a follow-up Epidemiology Study, to be funded by Merck, of cardiovascular events in former Vioxx users versus a matched population of non-users to further evaluate post-cessation risk, and retain jurisdiction in this Court to decide at a later time whether the findings of such a study justify screening for unrecognized or latent injuries other than UMI.

100. Class certification is also appropriate under Fed.R.Civ.P. 23(b)(3) because common issues of law and fact relative to the design, manufacture and marketing of Vioxx predominate over individual issues. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all members of the Class is impracticable.

101. The plaintiff and each member of the Class have a strong interest in obtaining the requested court-administered Medical Screening Program and a follow-up Epidemiology Study. Medical monitoring and study is calculated to facilitate the recognition of disease patterns and the early diagnosis and treatment of disease among plaintiffs and class members so affected and to, therefore, improve the prognosis and likelihood of an improved health outcome for those people. There is also a strong common interest in the collection of medical data.

102. Emergency notice of all individual class members is necessary pursuant to Fed.R.Civ.P. 23(d)(2); (e) for the protection of the class members as a result of the potential harm from Vioxx either alone or in combination with other drugs that the class members may have sustained, necessitating immediate medical diagnosis and treatment.

103. A class action is superior to any other available method for the fair and efficient adjudication of this dispute because common questions of law and fact overwhelming

predominate any questions that may affect only individual Class members, and there would be enormous economies to the courts and the parties in litigating the common issues on a classwide instead of repetitive individual basis. A class action approach would serve to consolidate and create a scenario with far fewer management difficulties because it provides the benefits of unity adjudication, judicial economy, economies of scale and comprehensive supervision by a single court. Any person who has been seriously injured and wishes to pursue an individual action outside the remedy sought in this complaint will have the opportunity to opt out.

104. The plaintiff, through counsel, has or will obtain adequate financial resources to assure that the interests of the Class will not be harmed.

105. Plaintiff, on behalf of themselves and the Class, seek equitable relief in the form of a Court-ordered and supervised medical monitoring program, funded by defendant, to assist plaintiff and the Class members in the early detection and treatment of illnesses caused by Vioxx. Such a program would include the following:

a. A method to notify individuals who ingested Vioxx of the increased risk of harm that they have suffered as a result of the ingestion of Vioxx;

b. Provision for the accumulation and analysis of relevant medical and demographic information from Class members including, but not limited to, the results of all appropriate diagnostic tests performed on Class members as part of a medical research and education fund;

c. Provision for the creation, maintenance, and operation of a medical registry in which relevant demographic and medical information concerning all Class members is gathered, maintained and analyzed;

d. Provision for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of Vioxx induced side effects;

e. Publication, and other dissemination, of all such information to members of the Class and their physicians, and,

f. Voluntary medical testing consistent with paragraphs (a) though (e) above.

106. Maintenance of this action as a class action for the classes alleged is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each member of each Class who has suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

107. Notice may be provided to class members by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other drug-related products liability cases and complex class actions.

108. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action certified for the Class.

## V. <u>CAUSES OF ACTION</u>

### COUNT I

### Request for Injunctive and Equitable Relief – Medical Monitoring

109. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

110. Merck fraudulently, intentionally, and negligently misrepresented the safety and effectiveness of Vioxx and fraudulently, intentionally and negligently concealed material adverse

information regarding the safety and effectiveness of Vioxx from consumers and health care providers.

111. At all relevant times, Merck owed a duty of care to Plaintiffs and the members of the Class:

a. To formulate, develop, manufacture, market, package, label, distribute, and sell Vioxx as safe for foreseeable use by consumers and without a significantly increased risk of serious disease such as unrecognized myocardial infarction;

b. To conduct appropriate testing to determine whether and to what extent ingestion of Vioxx, alone or in combination with other drugs, posed a significantly increased risk of harm to consumers;

c. To discover or otherwise obtain knowledge that ingestion of Vioxx, alone or in combination with other drugs, carries a significantly increased risk to consumers of serious disease, including without limitation unrecognized and latent injuries such as unrecognized myocardial infarction; and

d. To warn consumers that foreseeable usage of Vioxx, alone or in combination with other drugs, carries a significantly increased risk of serious disease.

112. Merck breached its duty of care to Plaintiff, as set forth in the preceding paragraph, by:

a. Failing negligently to formulate, develop, manufacture, market, package, label, distribute, and sell Vioxx as safe for foreseeable use by consumers and without a significantly increased risk of serious diseases;

b. Failing negligently to conduct appropriate testing to determine whether and to what extent ingestion of Vioxx, alone or in combination with other drugs, posed a significantly increased risk to consumers of these serious diseases;

c. Failing negligently to discover or otherwise obtain knowledge that ingestion of Vioxx, alone or in combination with other drugs, carries a significantly increased risk to consumers of these serious diseases;

d. Failing to warn consumers that foreseeable usage of Vioxx, alone or in combination with other drugs carries a significantly increased risk of these serious diseases;

e. Failing to formulate, develop, manufacture, market, package, label, distribute, promote, advertise, market, and sell Vioxx in accordance with Defendant's implied and express warranties of merchantability and fitness for intended purpose; and,

f. Failing to formulate, develop, manufacture, market, package, label, distribute, promote, advertise, market, and sell Vioxx without defects which pose a serious danger to human health.

113. As a proximate result of Merck's negligence, plaintiff and the members of the Class used Vioxx, alone or in combination with other drugs, and now have a significantly increased risk of having suffered an unrecognized, serious, latent disease for which there are medical screening procedures that make early detection possible and that are different from those normally recommended in the absence of exposure to Vioxx, alone or in combination, and are reasonably necessary according to contemporary medical and scientific principles.

114. The increased risks associated with having taken Vioxx makes non-routine medical screening reasonably necessary.

115. Monitoring and testing procedures exist to detect these serious latent diseases, such as Electrocardiograms and Echocardiograms.

116. Merck's actions render the company liable to pay all costs of a comprehensive Medical Monitoring Program and follow-up Epidemiology Study.

**COUNT II**

**Request for Injunctive and Equitable Relief – Emergency Notice**

117. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

118. As a proximate result of Merck's negligence, Plaintiff and the members of the Class used Vioxx, alone or in combination with other drugs, and now have a significantly increased risk of having suffered an unrecognized, serious, latent disease for which there are medical screening procedures that make early detection possible and that are different from those normally recommended in the absence of exposure to Vioxx, alone or in combination, and are reasonably necessary according to contemporary medical and scientific principles.

119. Upon information and belief, a substantial number, if not all of the member of the Class and their physicians are unaware that they may have suffered an unrecognized, serious, latent disease from the ingestion of Vioxx because Merck has and continues to fraudulently, intentionally, and negligently mis-represent the safety and effectiveness of Vioxx to the public and health care providers.

120. Equity dictates that this Court provide the Class a remedy that provides them with sufficient information appropriate for them to make informed decisions related to their physical well-being. Absent such notice the individual members of the Class will be irreparably harmed.

121. Class members are also entitled to any procedural protections deemed necessary and appropriate to protect their legal interests.

V. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, for herself and all others similarly situated, request that this Court enter a judgment against the defendant and in favor of the plaintiff, on behalf of herself and the members of the Class, and to award the following relief:

122. A preliminary injunction (to be made permanent) requiring the immediate Notification of all individuals in the class of the potential harm from Vioxx either alone or in combination with other drugs;

123. An Order declaring this action to be proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes, and finding that plaintiff is a proper representative of the Class;

124. Declaring the defendant financially responsible for notifying all class members that Vioxx is dangerous, toxic hazardous substance/product/drug and for taking all other actions requested herein;

125. An Order establishing a court-administered Medical Screening Program, to be funded by Merck, to provide for and/or reimburse medical and diagnostic tests for each member of the Class to detect unrecognized myocardial infarctions ("UMI") and other latent or unrecognized injuries and, if such injuries are detected and diagnosed, to educate plaintiff and the Class about available treatment strategies;

126. An Order for a follow-up Epidemiology Study, to be funded by Merck, of cardiovascular events in former Vioxx users versus a matched population of non-users to further evaluate post-cessation risk, and retaining jurisdiction in this Court to decide at a later time

whether the findings of such a study justify screening for unrecognized or latent injuries other than UMI; Entering judgment in favor of the plaintiff and the members of the plaintiff Class, and against the defendant;

127. That plaintiff, and the Class, recover their costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and,

128. That plaintiff and each member of the Class recover such additional and further relief as this Court may deem just and appropriate.

**JURY TRIAL DEMAND**

Plaintiff demand on behalf of themselves and all others similarly situated, a trial by jury on all issues so triable.

Dated: 7/27/, 2005

Respectfully submitted,

BY: ______________________

**Stephen M. Hunter**
**Law Offices of Stephen M. Hunter**
1255 Oaklawn Avenue, Suite 2
Cranston, Rhode Island 02920
(401) 463-3355 PHONE
(401) 490-7097 FAX

and co-counsel:

**ANDY BIRCHFIELD, JR.**
**J. PAUL SIZMORE**
**P. LEIGH O'DELL**
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
Post Office Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(334) 269-2343 PHONE
(334) 954-7555 FAX

Attorneys for the Plaintiffs